**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  05-190-01 (RBW)** |
| | : | |
| v | : | |
| | : | |
| **KENNETH MCDERMON** | : | |

**GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND**
**MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia,  respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early plea of guilty in this matter, which permitted the government to avoid preparing for trial and permitted the court to allocate its resources efficiently.  The United States also submits this memorandum in aid of sentencing.  For the reasons set forth herein, the government respectfully recommends that the Court sentence the defendant to the low end of the applicable guideline range.

**I.    BACKGROUND**

The defendant was charged in seven count indictment with five counts of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. Section 922(g)(1), one count of Unlawful Transfer of a Firearm, in violation of 18 U.S.C. Section 924(h), and one count of Distribution of Cocaine, in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C).  On July 27, 2005, the defendant pled guilty to Count Three of the indictment: Unlawful Transfer of a Firearm, in violation of 18 U.S.C. Section 924(h),  Count Eight of the indictment: Unlawful

Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by
Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. Section 922(g)(1), and
Count Ten of the indictment: Distribution of Cocaine, in violation of 21 U.S.C. Sections
841(a)(1) and 841(b)(1)(C).

In entering a plea of guilty, the defendant admitted to the following:

On March 14, 2005, Metropolitan Police Department ("MPD") undercover officer Sgt.
Dale Sutherland met with the defendant and a confidential informant to discuss the purchase of
three firearms. Sgt. Sutherland, the defendant, and the confidential informant met inside an
undercover storefront that purportedly worked on cars in the 1200 block of Mt. Olivet Road, NE,
in Washington, DC. The defendant tried to convince Sgt. Sutherland to front him money so that
he could go to Cleveland, Ohio, to purchase firearms that were to be resold in Washington, DC.
Sgt. Sutherland provided the defendant with $550 in U.S. currency. The defendant provided Sgt.
Sutherland with his military i.d. as security for the fronted money. The defendant needed an
additional $1000 to make the trip. The confidential informant was to accompany the defendant
on the trip to Ohio, so later on March 14, 2005, MPD Detective A.J. Feggans met with the
confidential informant and provided him with an additional $1000 in U.S. currency.

On March 16, 2005, the defendant returned to the undercover location. Sgt. Sutherland
provided the defendant with a large coat to use to cover the guns. The defendant left briefly, and
returned with a Hipoint 9 mm rifle, a Smith and Wesson .40 caliber handgun, and a Taurus 9 mm
handgun, plus 43 rounds of ammunition. Sgt. Sutherland handed the defendant $900 in MPD
funds to cover the remainder of the cost of the firearms. During the transfer of the firearms, Sgt.
Sutherland told the defendant that he planned to provide the firearms to drug dealers who

2

planned to use them to protect their stashes.

On May 18, 2005, Sgt. Sutherland spoke with the defendant about the purchase of several firearms. The defendant planned to go to Ohio to purchase the firearms and sell them to Sgt. Sutherland. The defendant and Sgt. Sutherland met that day outside the Red Star Tavern in Largo, MD. Sgt. Sutherland gave the defendant $4020 in U.S. currency. On May 19, 2005, Sgt. Sutherland spoke with the defendant via telephone several times about the transfer of the purchased firearms. The defendant informed Sgt. Sutherland that he was on his way back to DC from Cleveland, Ohio. The defendant met Sgt. Sutherland at West Virginia and Fenwick Streets, NE, in Washington, DC, at approximately 10:00 pm. The defendant arrived in a white Chevy blazer, accompanied by Frederick Bush. The defendant and Bush went to the rear of the vehicle and opened the trunk, from which they removed several labeled manufacturer's pistol boxes, and one unboxed firearm in a holster. Bush then got back into the white Chevy blazer, and the defendant approached the undercover vehicle. The defendant handed the boxes and the holstered weapon to Sgt. Sutherland, who opened each box and examined the firearms. The defendant provided the following firearms to Sgt. Sutherland: a CAI 9 mm pistol, a Bersa 9 mm pistol, three Ruger 9 mm pistols, one Taurus .357 revolver, and one Kel-Tec 9 mm pistol.

The defendant and Sgt. Sutherland then discussed the purchase of cocaine. The defendant returned to the white Chevy blazer and opened the passenger door and spoke to Bush. Bush handed McDermon a small plastic bag containing 2 grams of cocaine. The defendant walked back over to Sgt. Sutherland and gave him the cocaine. Sgt. Sutherland gave the arrest signal, and members of the MPD moved in and arrested McDermon and Bush.

In addition, the defendant admitted to the possession and distribution of the following

firearms: one HWM .38 caliber revolver and ammunition, four Taurus 9 mm handguns and ammunition, one Mossberg 12 gauge shotgun and shotgun shells, two 762 caliber rifles, and four Bersa .380 caliber pistols.  The defendant admitted that he knowingly and intentionally possessed each of the firearms described above, and that each was operable, and had traveled from another state into the District of Columbia.  Furthermore, the defendant admitted that at the time he committed these offenses, he had a 1999 felony criminal conviction for Embezzlement in Fairfax County, Virginia.

## II.   SENTENCING CALCULATION

### A   Statutory Minimums and Maximums

Pursuant to 18 United States Code § 924(a)(2), the crime of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year carries a maximum sentence of 10 years imprisonment, a $250,000 fine and up to three years of supervised release.  Pursuant to 18 U.S.C. Section 924(h), the crime of Unlawful Transfer of a Firearm carries a maximum sentence of 10 years imprisonment, a $250,000 fine and up to three years of supervised release.  Pursuant to 21 U.S.C. Section 841(b)(1)(C), the crime of Distribution of Cocaine carries a maximum sentence of twenty years of imprisonment, a $ 1,000,000 fine, and up to three years of supervised release, and .

### B.   Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 25.  See PSR ¶ 29.  (This calculation contemplates a three level departure for acceptance of responsibility.)  The PSR calculates the defendant's criminal history as Category II.  See PSR ¶ 36.  Therefore,  the guideline range for the defendant is calculated at

63 to 78 months.  <u>See</u> PSR ¶ 69.  For the reasons set forth, <u>infra</u> Section III of this

Memorandum, the government respectfully recommends that the Court sentence the defendant at

the low end of the Guidelines range calculated in the PSR.

## III.  <u>GOVERNMENT'S RECOMMENDATIONS</u>

### A.  <u>Acceptance of Responsibility</u>

The government agrees that the defendant's base offense level should be decreased by

three points pursuant to Section 3E1.1 of the Sentencing Guidelines.  He entered a guilty plea

early enough in the proceedings to avoid the government's having to prepare for trial, and he

appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-

sentence investigation. Accordingly, we are moving the Court to grant the additional one level

decrease in base offense level provided for in that Guideline provision.

### B.  <u>Application of the Federal Guidelines post-Booker</u>

Pursuant to the plea agreement between the government and the defendant, it is the

government's position that the Court should impose a sentence at the low end of the guidelines

range.  In <u>United States v. Booker,</u> 2005 WL 50108 (U.S. Jan. 12, 2005), the Supreme Court held

that the mandatory application of the United States Sentencing Guidelines violates the Sixth

Amendment principles articulated in <u>Blakely v. Washington,</u> 124 S. Ct. 2531 (2004). As a

consequence, the Court invalidated the statutory provision that made the Guidelines mandatory,

Title 18, United States Code, Section 3553(b)(1).  <u>Booker,</u> 2005 WL 50108, at *16. However, the

Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court

upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts

as to the most reasonable sentence for a particular defendant who has committed a particular

crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside

the range as set forth in the Guidelines, the Court must state in a written order of judgment and

commitment the specific reason for the imposition of a sentence different from that described in

the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review

by courts of appeals for "reasonableness." Id. at *24.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law

and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See

Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report

or determine that resolution not necessary to sentencing). "The district courts, while not bound

to apply the Guidelines, must consult those Guidelines and take them into account when

sentencing." Booker at *27 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of

this mandate – and the continued requirement of written explanations for sentences that fall

outside of the range called for by the Guidelines and the new standard of "reasonableness"

review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.

Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the

goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform

sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes,

represent the distillation of two decades of careful study of sentencing practices across the

country, and correlate as well to the varying severity of crimes as defined by Congress. The

Guidelines, consisting of offense characteristics and various grounds for departure, address the

considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the

6

nature and circumstances of the offense and the history and characteristics of the defendant"; "the

need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect

for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to

provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner"; and "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially

canvassing prior sentencing practice and attempting to identify and assign weights to all the

factors – both aggravating and mitigating – that judges traditionally used in determining an

appropriate sentence.  See United States Sentencing Comm'n, Supplementary Report on the

Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m)

(requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of

the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168

(Commission should produce a "complete set of guidelines that covers in one manner or another

all important variations that commonly may be expected in criminal cases").  Moreover, since the

Guidelines were adopted, the Sentencing Commission has continued to study district court and

appellate sentencing decisions and to "modify its Guidelines in light of what it learns."  Booker,

2005 WL 50108, at *26; see id. at *27 (Sentencing Commission will continue "collecting

information about actual district court sentencing decisions  . . . and revising the Guidelines

accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, at *24. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable.

8

Booker not only prevents courts from substituting their individual judgment about the
appropriateness of the Guidelines range without explaining with specificity their reasoning,
Booker also continues to subject the explanation of the decision to sentence outside of the
correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section
3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating
written explanations for imposing a sentence outside of the applicable Guideline range); 18
U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result
of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of
appeals to set aside a sentence outside the Guidelines range when the district court fails to
provide a required statement of reasons in the judgment and commitment order).

        Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing
and should occur absent unusual circumstances. This is so, said the court in United States v.
Wilson, 2005 WL 78552 (D. Utah Jan. 13, 2005) – the day after Booker was decided – because
the Guidelines represent the product of an expert commission, that has studied the sentencing
process at great length, under the specific mandate of Congress, to fashion recommended
sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson
held, plainly reflect the public's will, as expressed by their democratically elected
representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust
them to congressional preference. Wilson further observed that guided sentencing appears to
have had a positive impact in deterring criminal conduct throughout the country, and thus serves
the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge
Cassell determined that "the court will give heavy weight to the Guidelines in determining an

9

appropriate sentence.  In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at *1.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report.

C.    Basis for Government's Sentencing Recommendation

The defendant  has received a substantial benefit from this plea, and all the leniency he should receive is encompassed in the plea. The defendant received a three point decrease in his offense level as a result of his acceptance of responsibility.  Accordingly, the government believes that a term of incarceration at the low end of the prescribed Guideline range is appropriate and will give both the government and the defendant the benefit of the bargain negotiated.

The defendant is responsible for bringing a significant number of deadly weapons into the community, and he must be held accountable for his actions.  He distributed twenty-two firearms in Washington, D.C., over a three month period.  The defendant obviously did not care about where the guns would end up, or who they would hurt.  His cavalier attitude towards bringing guns into the District is evidenced by the fact that during the March 16 transaction, the defendant was informed by the undercover officer that the weapons would be used to protect a drug stash.

This Court is well aware of the damage caused in this community by illegal firearms. According to statistics maintained by the Metropolitan Police Department, as of October 13, 2005, there were 149 criminal homicides in the District in 2005.   Of those deaths, *77 %* were caused by firearms.  Of the 149 homicide victims, nine were juveniles, and six of those nine children were killed by gun violence.  The statistics for 2004 tell a similar story about the effect firearms have on the citizens of D.C.  There were 198 criminal homicides in the District in 2004. As in 2005,  *77 %* of the 2004 homicides were caused by firearms.  Of the 198 homicide victims, twenty-four were juveniles, and nineteen of those children were killed by guns.

Obviously the defendant cannot be held responsible for crimes which may have been committed with guns he supplied.  He must, however, be held responsible for his conduct, conduct which is not the result of a one-time, spur- of- the- moment act.  Instead, the defendant's crimes are the result of considerable planning and a continuing course of conduct.  The defendant traveled to Ohio to purchase firearms on at least three separate occasions, and he participated in a minimum of twelve different phone calls and meetings with the confidential informant and the undercover officer to discuss, arrange, and transfer the firearms.  He had plenty of time to consider the consequences of his actions, not only to himself, but to his community.  He consciously chose to disregard any thought of consequences.  Had the guns been sold to those the defendant thought he was selling to, instead of the undercover officers, there can be little doubt that the consequences would have been deadly to someone in the District.

**IV.**    **CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the defendant to the low end of the applicable guidelines range for the offenses of Unlawful Transfer of a Firearm,

Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable

by Imprisonment for a Term Exceeding One Year, and Distribution of Cocaine.

Respectfully submitted,


KENNETH L. WAINSTEIN
United States Attorney
Bar No. 451058


_____

Catherine K. Connelly
Assistant United States Attorney
Narcotics Section, Mass.  Bar No. 649430
555 4th Street, N.W.  #4844
Washington, DC 20001
Phone: 616-3384
Fax: 353-9414




CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of the foregoing to be served by mail upon the attorney for the defendant, Carlos Vanegas, this 17th day of October, 2005.


_____

Catherine Connelly
Assistant United States Attorney

12